**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| United States of America | : | |
| | : | Case No. 1:23-cr-00267-APM |
| v. | : | |
| | : | Hon. Judge Amit P. Mehta |
| Adam Obest, | : | |
| *Defendant* | : | |
| | : | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING
### AND ASSESSMENT OF 18 U.S.C. § 3553(a) SENTENCING FACTORS

COMES NOW, Adam Obest, by and through counsel, and provides this Court with his position regarding the application of the sentencing factors to the Court's obligation to impose a sentence "sufficient, but not greater than necessary to comply" with the factors found in 18 U.S.C. § 3553(a). Defendant's objections to the sentencing guidelines are also enclosed.

Mr. Obest is sincerely aware of the seriousness of his conduct on January 6, 2021, and that of the larger collective who gathered in violent protest that day. He has taken and continues to take full and complete responsibility for his actions, including at trial where he testified candidly, openly, and truthfully to this Court, and where he expressed sincere remorse for his actions that day. Consistent with his testimony at trial, Mr. Obest will make a statement at sentencing further taking responsibility for his actions.

He understands the great harm and damage that came from January 6, 2021. And he understands that punishment is necessary for his role. But given the specific circumstances of his case, he is asking for a below guidelines sentence based upon the appropriate application of the guidelines to the nature and circumstances of the offense, the history and characteristics of Mr. Obest, and the need for just punishment – all while avoiding unwarranted sentencing disparities. For the reasons discussed in this Memorandum and to be argued at Sentencing, Mr.

Obest respectfully requests a sentence that includes no more than one year and a day of active incarceration.

## Background

On August 9, 2023, Mr. Obest was indicted on eight counts related to his conduct on January 6, 2021. Mr. Obest was arrested on June 13, 2023, and was released the same day on bond. Since then, he has been fully compliant with his conditions of pretrial supervision and will continue to obey this Court's orders going forward.

Following a contested bench trial, on August 2, 2024, the Court found Mr. Obest guilty of Counts One (Civil Disorder), Three (Assaulting, Resisting, or Impeding Certain Officers), and Eight (Act of Physical Violence in the Capitol Grounds); and lesser included offenses of Counts Five (Entering and Remaining in a Restricted Building or Grounds), Six (Disorderly and Disruptive Conduct in a Restricted Building or Grounds), and Seven (Engaging in Physical Violence in a Restricted Building or Grounds).  Consistent with his pleas, the Court found Mr. Obest not guilty of Counts Two and Four.

The Court's findings of facts and law were fully laid out on the record and as found in Document 45, which outlines the Court's Oral Ruling.  Mr. Obest conceded—through argument and his testimony—many of the relevant facts and issues at trial.  While it was not the singular issue, the defense at trial primarily revolved around whether Mr. Obest used his flagpole as a deadly or dangerous weapon.  The Court ultimately acquitted Mr. Obest of this element throughout the charges.

## Argument

**A.**    **The Court shall impose a sentence sufficient, but not greater than necessary, to comply with 18 U.S.C. § 3553(a).**

"The court shall impose a sentence sufficient, but not greater than necessary, to comply

with" 18 U.S.C. § 3553(a)'s mandates. These include considering the "nature and circumstances of the offense and the history and characteristics of the defendant," reflecting the seriousness of the offense, affording adequate deterrence, protecting the public, and providing necessary rehabilitation to the defendant. 18 U.S.C. § 3553(a)(1-2).

In *United States v. Booker*, 125 U.S. 738 (2005), the United States Supreme Court restored the sentencing judges the power to use discretion in determining appropriate sentences. "In the wake of *Booker*, therefore, the discretion of a sentencing court is no longer bound by the range prescribed by the sentencing guidelines. Nevertheless, a sentencing court is still required to 'consult [the] guidelines and take them into account when sentencing.'" *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005) (quoting *Booker*, 125 U.S. at 767). In light of *Booker*, "a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider the range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *Id*. (citation omitted).

**B.**     **18 U.S.C. § 3553(a) Factors to Consider in Sentencing.**

    **a.**     **Nature and Circumstances of the Offense.**

Mr. Obest went to trial, indicted on eight counts.  As recounted above, the Court found him not guilty of two counts, guilty of three Courts, and guilty of lesser included offenses on three Counts.  The evidence presented at trial demonstrated that Mr. Obest came to Washington, D.C., on January 6, 2021, to hear former President Trump's speech at the Ellipse.  His sole aim was to engage in peaceful protests.  He did not coordinate or plan with a group to cause disruption, and he did not bring weapons or armament.  Instead, he arrived with his wife and a few friends, a water bottle, and his flag.

Mr. Obest did not enter the Capitol, he did not go into the House or Senate chambers, he did not walk onto the floor of the Capitol, and he did not vandalize property that day. He was not, and is not, a member of the Proud Boys or any other groups that engaged in deeper planning that day. He is akin to other protestors who, unfortunately and inexcusably, got swept up in the chaos and responded inappropriately to police force. Rather than complying with officers' orders, he saw officers pushing back on protestors, pepper spraying protestors (including his wife), and restricting their movements. In the moment and without the reflection of time, he believed that he was permitted to attend a lawful rally in the area and the police obstruction (to his mind at the time) was confusing and concerning. It is clear, however, that Mr. Obest was not part of any larger group, gang, or movement, nor did he intend to delay the certification of the Electoral College vote count or to injure members of Congress or officers.

**b.    History and Characteristics of the Defendant.**

Mr. Obest is a 43-year-old father of six to Seth (age 18), Evelina (age 16), Solomon (age 14), Brave (age 11), Christian (age 10), and Stiven (age 11), husband of Anastasiia Obest, and younger brother to James Goldschmidt. While he was born and raised in New Jersey, he spent most of his adult life in Maryland.

At age 17, Mr. Obest joined the Army National Guard. He served for over 20 years, deploying to Germany in 2005-2006 and Egypt in 2011-2012. When he returned from deployment to Germany, he moved to Maryland and began his family. Upon his return from his deployment in Egypt, he continued to serve his country by joining the federal government's workforce. In August 2012, he began working at the Centers for Medicare and Medicaid Services (CMS), starting as a secretary and working his way up to a management analyst, then to a program analyst. He resigned in November 2023 and left on good terms such that he is

considered for reemployment. Since September 2023, Mr. Obest has worked in the solar power industry, working as a full-time Community Solar Advisor/Subcontractor for Shared Solar Advisors USA. His current employer is aware of his instant offenses and has continued to support him.

Mr. Obest's family and faith are the center of his universe. He has been, and continues to be, dedicated to his six children and wife. As the breadwinner, Mr. Obest's children and his wife rely on his support. Facing potential imprisonment which would cause his family to struggle has highlighted for Mr. Obest the seriousness of his actions, and the consequences of the decisions he made on January 6, 2021.

He also realizes that facing potential imprisonment would also take him away from his active faith and community involvement, including teaching Sunday School at his Church, serving as a youth sports coach, and numerous other community service engagements.  As demonstrated by his words and the supportive letters of friends and family, Mr. Obest's faith has helped him build a better life for himself and his family.

As one example, Mr. Obest used marijuana and alcohol at the age of 15 to cope with his father's passing. But his faith in God and relationship with Jesus caused him to stop using those substances and place in his faith and dependence in God.  His faith has also encouraged him to seek Christian-based mental health counseling to cope with the challenges he has faced with physical abuse as a child perpetrated by his stepfather, the effects of his divorce, and his experiences in the military. Mr. Obest uses his faith to better his life and the lives of those around him.

The realization that his own, self-described "stupid" actions on January 6th will lead to consequences for those around him has intensified Mr. Obest's guilt and remorse for his actions.

His family and friends are all aware of the severity of this offense. Nevertheless, they are committed to supporting him to ensure that he refrains from any future criminal conduct. The letters attached speak not only of his rehabilitation, but also to the supportive and faithful network upon which Mr. Obest can lean, which further supports future deterrence.

Mr. Obest's family, friends, and community all describe him as empathetic, hardworking, dedicated to his family, and dedicated to the betterment of his community. It is clear from his own actions, and from what others have said about him, that he is a serious asset to his community. It is also clear that Mr. Obest has expressed deep remorse for his actions on January 6 to those around him and realizes the impact that his decisions will have on his family and community. Those closest to him can attest to his character, as the attached letters show.

Cara Draper is a neighbor of Mr. Obest who has witnessed first-hand the extent of Mr. Obest's generosity and dedication to his community. When a storm severely damaged Ms. Draper's home, Mr. Obest helped her through the process of repairing the damage to her home, saving her money and reducing the stress of managing the destruction while being a single mother. Exhibit 2, Letter from Cara Draper. Since then, Ms. Draper has come to know the Obest family, and Mr. Obest has continued to play a role in her family's life by mentoring her son through challenging times.

Mr. Obest's dedication to the youth of his community extends well beyond the Draper family, as he participates as a volunteer umpire with his local little league. Blaine E. Young, Jr. is the Umpire-in-Chief for the Thurmont Little League and is involved in other capacities with regional little league associations. Mr. Young has seen the impact Mr. Obest has had on their community's youth and on his own family. Exhibit 3, Letter from Blaine E. Young, Jr. Mr. Young has seen Mr. Obest encourage good sportsmanship and team behavior in his own children

and understands that potential confinement would hinder Mr. Obest's service to his community and dedication to his family.

Robert Smith is a friend of Mr. Obest who has known him since high school. They have remained friends for over 25 years, and during that time, Mr. Smith has known Mr. Obest to be selfless in helping others. Exhibit 5, Letter from Robert Smith. He has seen Mr. Obest regularly assist a local homeless man by driving him places, feeding him, and helping him with other needs. *Id*.

Adam Speedy is a former classmate of Mr. Obest who has known him for 21 years. Mr. Speedy recalls that when he was injured from a fall, Mr. Obest, without hesitation, offered his assistance and gave Mr. Speedy a place to stay. Exhibit 8, Letter from Adam Speedy. Mr. Speedy has witnessed Mr. Obest not only help him and his family, but he has watched Mr. Obest help others as well. Mr. Speedy describes Mr. Obest as a self-sacrificial person with a heart for people in dire circumstances. *Id*. He notes that Mr. Obest has gone into neighborhoods in places from Baltimore, Maryland to Mumbai, India to help those in need. *Id*. He also describes Mr. Obest as a dedicated family man and great neighbor to those around him. *Id*.

Yusun Beck is a friend of Mr. Obest who has known him since high school but describes Mr. Obest as a brother. Exhibit 9, Letter from Yusun Beck. Mr. Beck notes that while he does not agree with Mr. Obest's actions on January 6 or the surrounding political environment of the day, Mr. Beck has noticed Mr. Obest's deep and sincere remorse for his actions. *Id*. Mr. Beck recalls Mr. Obest telling him that he "would never make this mistake again" and that he learned his lesson. *Id*.

James Bresette is a former colleague at the Centers for Medicare and Medicaid Services, who has known Mr. Obest for almost 12 years. Mr. Bresette is a pharmacist who was given a

chance, and that chance resulted in great service and impact in his community. Exhibit 16, Letter from James Bresette. Mr. Bresette was a juvenile delinquent as a teenager, but he was given a chance by his California Juvenile Work Project supervisor and mentors along the way. *Id*. That chance he was given allowed him to turn his life around, and he contributed greatly to his community by serving in the Air Force, the National Security Agency, the Indian Health Service, the Federal Bureau of Prisons, as a pharmacist, as a professor and dean of the University of Maryland Eastern Schore School of Pharmacy and Health Professions, and now as a humanitarian aid worker with USAID. *Id*. Without question, Mr. Bresette sees the same qualities in Mr. Obest as he sees in himself, and knows Mr. Obest to be a motivated public servant, ready to continue serving his community. Mr. Bresette urges this Court to give Mr. Obest the same opportunity that was given to him.

### c.   The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

The nature and circumstances of the offense and Mr. Obest's own personal characteristics must be balanced with imposing a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. Mr. Obest understands the seriousness of his actions and, indeed, the entirety of what occurred on January 6, 2021.

Mr. Obest takes full responsibility for his actions and his role.  He has spent every day since January 6 thinking about, contemplating, and reliving that day and what should not have been.  He faces the constant reminder of his wrongdoing.  Likewise, he suffers from the seriousness of his offense every day, whether having an ankle monitor for almost 18 months or having to face family and friends with the indelible shame this has brought upon himself and his family.  And throughout this all, he has faced the constant uncertainty of whether he will lose

everything he has worked for. Every future job application will require the disclosure of his crime, and he will forever live with the ignominy of his actions.

As serious as Mr. Obest's actions were, they must be viewed in context when considering sentencing. Unlike others, Mr. Obest did not enter the Capitol, he did not steal anything from the Capitol grounds, he did not take home trophies of the day. He did not bring weapons like pepper spray, knives, or firearms with him. He was not clad in protective armor, nor did he wear a gas mask. He did not come prepared for violence; he was swept up in it. In the heat of the moment, after seeing what he believed to be a wrongful use of force against him, his wife, and those around him, he unjustifiably engaged in violence. All of these factors speak to the relative culpability of Mr. Obest, as compared to others that day. Others obviously came prepared for violence. They brought weapons, defensive armor to prevent injuries, gas masks in anticipation of being pepper sprayed, and gruesome props. Mr. Obest brought an American flag—a flag he misused, but he did not come prepared to perpetrate violence. As this Court is well aware, the culpability of one cannot be ascribed to all who participated in the events of January 6th. There were many groups of people, with many different motives and many different levels of culpability, who should all be evaluated for their own actions.

These factors of "promoting respect for the law" and "providing just punishment" are particularly important given Mr. Obest's request for credit for his acceptance of responsibility. Mr. Obest urges the court to consider whether giving a higher sentence to a defendant who exercises his constitutional right to a trial promotes respect for the law and whether it is just to punish Mr. Obest for doing so. Mr. Obest did not dispute much of his conduct that day. He did not go to trial to waste judicial resources or pretend he did not engage in criminal activity. Instead, Mr. Obest made a rather emotional showing of remorse on the stand and took complete

responsibility for his actions. Therefore, he should not be penalized for not pleading guilty to charges this Honorable Court acquitted Mr. Obest of. Doing so would not promote respect for the law, nor would it provide just punishment.

### d.    To Afford Adequate Deterrence to Criminal Conduct.

Mr. Obest has been adequately deterred and is not likely to engage in future criminal conduct. He comes before this court with a relatively minor criminal record, free of any felony convictions. Therefore, having multiple felonies on his record serves as a greater punishment and deterrence to him than it may for someone with an extensive record. He will live with its consequences forever, both professionally and personally. Because of these charges and his incarceration, his life will be put on hold for months. He may have to wait months to reunite with his family, months to continue to watch his children grow up, months to continue to use his faith to better his community, months to return to serving the country he so loves, and months to continue being a productive, earning member of society that can take care of his family.

These collateral consequences are more than enough to deter Mr. Obest from criminal conduct, especially conduct similar to that of January 6th. Nevertheless, a lengthy prison sentence only goes so far in addressing the principles of sentencing. The National Institute of Justice by Department of Justice issued a summary on research on deterrence. It states that increasing the severity of punishment does little to deter crime." U.S. Dep't of Justice, Office of Justice Programs, Nat'l Inst. Of Justice, *Five Things to Know About Deterrence* (July 2014) (relying on Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Justice in America 199 (2013)).[1] While punishment has a deterrent effect, research shows that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael

---

[1] https://nij.ojp.gov/library/publications/five-things-about-deterrence

Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006)." *Id*.

**C.    The Sentencing Guidelines.**

    **a.    Mr. Obest's Total Offense Level Should be 14.**

For Count Group One, which encapsulates Counts One, Three, and Seven for the harm to MPD Officer Chen, the Government requests a 6-level enhancement under USSG § 3A1.2(b), which applies when the victim was a government officer, and the offense of conviction was motivated by such status. While Mr. Obest does not contest that MPD Officer Chen is a government officer, he does object to the characterization that he was motivated by Officer Chen's status as a police officer.

Mr. Obest was a federal employee, former soldier, and supporter of law enforcement. His actions were not motivated by the fact that Officer Chen was a police officer; rather, his actions against Officer Chen were inexcusably reactionary and motivated by chaos of the crowd and the recent pepper spray employed on him and his wife while he was attempting to attend what he believed was a lawful Prayer Protest. Officer Chen could have been replaced by anybody, another protestor, a random person, an attacker, a passerby—anyone who hurt his wife—and his reaction would have been the same under the circumstances. Again, while his reaction was not appropriate, lawful, or excusable, but it certainly was not motivated by anybody's status.

Moreover, when he swung or moved his flagpole in the crowd, he did not intend to strike at a government officer due to anyone's status. As this Court found, Mr. Obest's flagpole struck multiple people, officers and other rioters alike. Mr. Obest's actions with his flagpole were not motivated by one's status as a rioter or an officer.

There is no factual basis for such a finding. An adjustment, like a specific offense

characteristic and any other aspects of the sentencing guidelines, must rest upon a factual basis. While Mr. Obest was undoubtedly acting with abandon at times, and while doing so, made contact with both rioters and officers, he did so without regard to anybody's status as a government officer. The statutory penalties prescribed by Congress under the statute as well as the Sentencing Guidelines' cross-reference to USSG § 2A2.2, which significantly raises the base offense level applicable to Mr. Obest's conduct, already sufficiently captures the seriousness of his conduct. As such, Mr. Obest contends that the adjustment under USSG § 3A1.2 does not apply, and the Adjusted Offense Level for Count Group One should be 14.

Additionally, for Count Group Two, Mr. Obest objects to the use of the cross-reference to USSG § 2A2.2(a) because the groups involve different victims. USSG § 3D1.2(b) indicates that counts should group together for guidelines purposes when they involve the same victims and two or more acts or transactions connected by a common scheme or plan. Counts are grouped together to account for all the harm done to discrete victims, and different victims have different groups of counts.

Here, Count Group One includes Counts One, Three, and Seven, and were grouped pursuant to USSG § 3D1.2(b) to account for the harms to MPD Officer Chen. Count Group Two includes Counts Five and Six and were grouped pursuant to USSG § 3D1.2(b) to account for the harms to Congress. Because these are two discrete victims, the conduct that constitutes harm to one victim should not be used in calculating the offense level attributable to a separate victim in another count group. Instead, all of the harm to each separate victim should be contained to each separate count group. In other words, the harm to Officer Chen should not be used when determining the offense level for the count group representing the harm to Congress. It should be contained to the count group representing the harm to Officer Chen.

Nevertheless, the PSR uses the conduct towards Officer Chen to raise the offense level of Count Group Two, even though the latter represents the harm to Congress, not Officer Chen. Because Count Group Two represents only the harm to Congress, USSG § 2A2.4 and its cross-reference to § 2A2.2 are inappropriate. Mr. Obest contends that the correct guideline for Count Group Two is USSG § 2B2.3 which provides for a base offense level of 4. Because the offense occurred on restricted grounds, 2 levels should be added pursuant to § 2B2.3(b)(1)(vii). This would bring the Adjusted Offense Level for Count Group Two to 6.

With the correct Adjusted Offense Levels in mind, the Multiple Count Adjustment and the number of units assigned to the count groups are implicated. Because the Adjusted Offense Level of Count Group One is 14 and the Adjusted Offense Level of Count Group Two is 6, the total number of Units is 2. Therefore, 2 levels should be added which would yield a Combined Adjusted Offense Level of 16.

Finally, Mr. Obest objects to the lack of adjustment for acceptance of responsibility. While Mr. Obest exercised his Constitutional right to a trial, he did not waste judicial or prosecutorial resources, nor did he dispute much of the factual allegations against him. On the contrary, Mr. Obest opted for a bench trial so as not to unnecessarily waste resources while also ensuring that he was found guilty only to offenses he was actually guilty of. Moreover, Mr. Obest testified truthfully at trial and did not dodge responsibility for his actions. He acknowledged, as he does today, that his actions on January 6th and the harm he caused are inexcusable, inappropriate, and never to be repeated.

It should be noted that a reduction for acceptance of responsibility does not hinge solely on whether or not a defendant pleads guilty. Defendants who plead guilty are not entitled to the adjustment just because they plead guilty, and those who go to trial are not categorically barred

from the adjustment either. *See* USSG § 3E1.1, comment. (n. 2). In cases where a defendant goes to trial, a "determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct." *Id*.

Mr. Obest and Counsel represented that Mr. Obest would plead guilty to the conduct as charged without the deadly or dangerous weapon elements. Even at trial, Mr. Obest took responsibility for his conduct and admitted he was wrong in his testimony. Ultimately, the Court agreed with Mr. Obest that the deadly or dangerous weapon element was not met, and thus acquitted him of charges related to such conduct.

In the end, Mr. Obest should not be penalized simply because he vindicated his rights under the Constitution. His decision to go to trial rather than plead guilty was objectively sensical, since it led to two acquittals of charges the Government brought against him while also not unnecessarily wasting government resources. Therefore, Mr. Obest requests that the two-level adjustment for acceptance of responsibility be applied.

With the correct application of the Sentencing Guidelines and the application of the adjustment for acceptance of responsibility, Mr. Obest believes that his Total Offense Level should be 14.

### b. **Mr. Obest's Criminal History Category Overstates the Seriousness of His Criminal History**

While U.S. Probation Officer Field corrected Mr. Obest's Criminal History Category to II based upon his convictions, this still overstates the seriousness of Mr. Obest's criminal history or the likelihood that he will commit over crimes. All of Mr. Obest's convictions stem from a series of disputes with his ex-wife, related to their divorce and child custody. He never threatened or harmed his ex-wife, but the parties did have disputes over contact with and access to the children, leading his ex-wife to call the police often and make allegations while they were going

through their divorce and custody cases.

None of his convictions were felonies and none of his convictions were violent in nature. While Mr. Obest takes full responsibility for his past conduct, and acknowledges that his conduct underpinning his convictions were violations of the law, a Criminal History Category of II overstates the seriousness of Mr. Obest's criminal history since his convictions stem from one issue and overstate his likelihood of recidivism. Moreover, outside of the criminal history events stemming from child custody issues, Mr. Obest has not sustained criminal convictions for unrelated conduct.

For these reasons, Mr. Obest respectfully requests a departure under USSG §4A1.3 to account for his overstated Criminal History Category and requests that he be placed in Category I. A Total Offense Level of 14 and a Criminal History Category of I renders an advisory guidelines range of imprisonment is 15-21 months.

**D.      Avoiding Unwarranted Sentencing Disparities.**

If this Court were to impose a sentence within or greater than the 15-21 month advisory guideline range, it would create an unwarranted sentencing disparity amongst cases that this Court has already sentenced or are awaiting sentencing. 18 U.S.C. § 3553(a)(6) directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Due to the large number of January 6 cases, there are many cases available for comparison, all subject to unique facts and criminal histories. Nonetheless, comparison and consideration of these cases is helpful.

There were many January 6 defendants who were convicted of 18 U.S.C. § 111(a) or (b) offenses who wielded flagpoles that day. It is evident that Mr. Obest's conduct involving his flagpole places him at a lower level of culpability as compared to other January 6 defendants

outlined below.

For example, Douglas Harrington, who seemingly came prepared for violence clad in armor and a gas mask, approached a line of police officers on the Upper West Terrace and used the bottom of his flagpole to strike in the direction of an officer. While the officers that Harrington was engaged with were distracted dealing with another rioter, Harrington took advantage of the distracted state of the officers and raised his flagpole to strike them. Then, when another officer intervened, Harrington swung his flagpole at that officer and struck the officer's left hand, wrist, and helmet. Even after that, Harrington continued swinging his flagpole at officers. Shortly after his assault of officers, Harrington coordinated with other rioters to lift a large, opaque object in front of the police line to block their view of the advancing crowd. When pushed back by officers, Harrington grabbed at an officer's baton and tried to shove another officer. Harrington received 40 months of imprisonment after the Government requested 96 months.

Michael Steven Perkins and Joshua Christopher Doolin were co-defendants who also used a flagpole. Perkins picked up a flagpole he found and thrusted it into the chest of an approaching officer. Perkins then raised the flagpole over his head and swung it to strike two officers in the back of their heads before spending around 3 hours in the Capitol. Perkins was sentenced to 48 months' imprisonment and his co-defendant, Joshua Doolin, was sentenced to 18 months' imprisonment.

Peter Francis Stager, another defendant who used a flagpole, was sentenced to 52 months' imprisonment. However, he raised an American flag and beat a downed officer who was dragged into a crowd of rioters and struck him at least three times. Stager stood over another officer who was on the ground and shouter, "Fuck you! Fucking traitor!" He continued that day

and filmed the Capitol building while commenting "That entire building is filled with treasonous traitors. Death is the only remedy for what's in that building...Every single one of those Capitol law enforcement officers, death is the remedy, that is the only remedy they get."

Terry Allen climbed onto a wall and watched rioters clash with police before jumping down and moving towards the scaffolding where he removed barricades. On the West Plaza, he engaged with officers and used a flagpole to reach towards objects officers dropped on the ground before jabbing the flagpole at officers' torsos. Later, Allen moved to another police line and removed sections of the fencing. Then, he returned to the West Plaza armed with his flagpole and a metal bar, aimed both at officers, and hurled the metal bar towards officers, striking at least one officer. Allen was sentenced to 24 months' imprisonment after the Government requested 70 months.

Thomas Webster, a retired NYPD officer who charged through the metal barricades at the Capitol, attacked police using a flagpole. Before breaking through the barriers, he yelled at officers, "You communist motherfucker, fuck you!" After that, he swung a flagpole and then charged towards officers with clenched fists before tackling an officer to the ground. On the ground, Webster tried to remove the officer's helmet and gas mask which choked him. While the officer struggled to breathe, other rioters kicked the officer. Webster also shoved a metal gate into an officer's body before swinging a flagpole towards an officer. Webster was sentenced to 120 months' imprisonment.

Farhad and Farbod Azari, a father and son duo, assaulted officer using, among other things, a flagpole. While rioters took apart sections of the fencing at the steps of the West Front, Farbod approached officers and spat at them. Farbod then retreated before returning to throw a water bottle at officers. At the same time, Farhad threw at water bottle at officers in another

police line and rushed police while officers attempted to reestablish a broken police line. He kicked a bike rack and worked with other rioters to push against officers to reopen the newly established line. Later, Farbod worked with others to dismantle fencing and then confronted another police line. There, Farbod yelled at officers and tried to kick an object he saw on the ground towards officers. Because of his failed attempt, he picked up a flagpole he found and hurled it towards officers. Then, he found an airhorn and hurled that towards officers. Almost an hour later, Farbod joined another group and jabbed a flagpole at a line of officers, hitting an officer's arm. At the same time, Farhad breached the Senate Wing Doors through a window and was one of the first rioters to enter the Capitol. While inside, he rushed a line of officers assembled in the Crypt. Thirty minutes later, Farhad reentered the Capitol building and left, encouraging others to go inside. At the same time, Farbod attempted to break through a line of officers by pushing his shoulder into an officer before throwing a water bottle at the line. Then, he picked up a flagpole and swung it towards the officers then threw it like a spear towards officers. Farhad was sentenced to 30 months' imprisonment and Farbod was sentenced to 50 months' imprisonment.

It is clear that even within the class of January 6th defendants that used flagpoles, Mr. Obest's conduct is much less culpable in comparison. He was not clad in armor and a gas mask, prepared for violence. He did not call for the death of members of Congress or officers protecting the Capitol. He did not enter the Capitol and force his way through police lines. He did not encourage others to enter the Capitol. Instead, he reacted after he was pepper sprayed and he believed that he was being denied his right to peacefully assemble—while his conduct was criminal, it was not the product of a broader motive or intent towards Congress or the officers protecting the Capitol.

The following is a chart of some of the convictions under 18 U.S.C. § 111(a) and (b), their fact patterns, and their sentences. Many of the defendants outlined below have conduct similar to Mr. Obest, and many more have conduct that is far worse. Because Mr. Obest's involvement in the day as a whole is less than that of many other defendants, because he was not a part of a consorted effort of any kind to disrupt the certification of the Electoral College vote count, and because he did not continue into the Capitol and cause mayhem inside, Mr. Obest believes that a below guidelines sentence is appropriate.

| Name | Charge | Facts | Sentence |
|---|---|---|---|
| USA v. Mathew Council, 1:21-cr-207-TNM | 231(a)(3), 111(a)(1), 1752(a)(1) and (2) | Defendant entered the senate wing doors with the initial breach. He was with a larger group of rioters. He continued to push into the building, shouting at officers who were trying to contain him. Once inside, he continued undeterred and pushed an officer he encountered. He had to be pepper sprayed by several officers before he was detained. | 6 months home detention |
| Leffingwell, Mark 1:21-cr-00005-ABJ | 111(a) | While USCP and MPD officers held a line to prevent protesters from entering the Senate Wing entrance, Mr. Leffingwell punched two officers. As the officers tried to detain him, he punched one of the officers again. | 6 months, Gov requested 27 months |
| USA v. Philip Young, 1:21-cr-617-DLF | 111(a)(1), 231(a)(3) | Defendant assaulted a line of law enforcement with a metal barricade | 8 months, Government requested 40 months |

| | | | |
|---|---|---|---|
| USA v. Michael Lockwood, 1:23-cr-146-RDM | 111(a)(1) | Assaulted law enforcement officer while officer was attempting to detain another protestor.  Took officer's baton, leaving officer vulnerable, and left with the baton in hand. | 12 months and a day, Government requested 27 months |
| Johnston, Jay James 1:23-cr-00237-CJN | | Mr. Johnston was a part of a mob of rioters that congregated near the Tunnel near the Lower West Plaza. He encouraged other rioters to enter the tunnel while pushing his way into the Tunnel towards the police line and towards the Capitol. During that time, he had a stolen police riot shield and moved towards the police line with it and joined the group push against the line. While he was pushed back towards the Tunnel entrance, he turned back around towards the police line to once again push against police, causing an MPD officer to be crushed between the crowd and a door. | 12 months 1 day, Government requested 18 months |
| USA v. Troy Sargent, 1:21-cr-258-TFH | 111(a), 231(a)(3), 1752(a)(1) and (2) | Defendant swung open hand at an officer and made contact. He then swung again at the same officer but made contact with someone else. He later boasted about it on social media that he "got two hits on a rookie cop." | 14 months |
| Mehaffie, David 1:21-cr-00040-TNM | 111(a) | Mr. Mehaffie known as the "Tunnel Commander" worked with two others and took a leadership role in breaching the tunnel. For 26 minutes, Mr. Mehaffie hung from the arch of the tunnel and directed, coordinated, commanded, and encouraged others rush | 14 months, Government requested 64 months |

| | | forward and attack officers. | |
|---|---|---|---|
| Shively, Barton Wade 1:21-cr-00151-APM | | Mr. Shively traveled with friends to attend the Stop the Steal rally. After the rally, he walked to the Capitol where he struck and assaulted the head, hand, and shoulder area of an officer. Mr. Shively also walked up to another officer after barricades were breached and grabbed that officer by the jacket and yelled at them. | 18 months, Government requested 37 months |
| USA v. Michael Dickinson, 1:21-cr-649-JDB | 111(a)(1) | Defendant walked up to a line of officers guarding the north side. He threw coffee tumbler at an officer. It struck the officer in the face and chest and bounced off to hit another officer. He then picked up a bucket of unknown liquid and dumped it on other officers. | 20 months |
| USA v. Michael Eckerman, 1:21-cr-513-RBW | 111(a)(1) | Eckerman recruited friends and family members for weeks leading up to the rally. He encouraged and filmed another rioter assaulting a police officer, calling him a "traitor." He walked into the Capitol through the broken senate wing window. He was crucial in breaching a line inside when he pushed an officer causing him to fall down. After the officer fell, another rioter sprayed him in the face with a fire extinguisher. His actions allowed the mob to penetrate the second floor of the Capitol. He took celebratory photos, bragged about his behavior, and assaulting law enforcement. He continued to message | 20 months |

| | | with friends and family members about a "civil war" and boasting about his behavior. | |
|---|---|---|---|
| USA v. Joshua Hernandez, 1:22-cr-042-CRC | 111(a)(1), 231(a)(3) | He incited the crowd before entering the Senate Wing Doors through a broken window. He joined rioters and shouted at them to push officers so they can open the door to other rioters. He used a flagpole and hit an officer in the head with the metal portion. He entered the Capitol. | 24 months |
| Willden, Ricky 1:21-cr-00423-RC | 111(a) | Mr. Willden was standing near the East Columbus doors to the Capitol Building. He held a green cannister in one of his hands, raised it, and sprayed a USCP officer with a chemical irritant. After he sprayed the officer, he threw the cannister at the officers. Mr. Willden then gained entrance into the Rotunda and walked around inside. | 24 months |
| USA v. Kevin Creek, 1:21-cr-645-DLF | 111(a)(1) | Mr. Creek played a pivotal role in breaking the police's defensive lines on the West Terrace. Mr. Creek assaulted a Sergeant who was overseeing a thin line of police. His attack according to AUSA Fifield was a pivotal moment in the defense of the Capitol. When asked if he was remorseful prior to his arrest, he replied "50/50." | 27 months |

| USA v. David Judd, 1:21-cr-0040-TNM | 111(a)(1) | Judd was in the lower west tunnel. He waived other rioters into the tunnel, participated in the heave-ho against the police line, passed around police shields to other rioters, and finally after being in the tunnel for close to 25 minutes, lit an object that appeared to be a fire cracker and threw it at the police line. He stayed in the tunnel even after the police had cleared the tunnel and tried to push against the second line the officers created. | 32 months Gov requested 90 months |
| Byerly, Alan 1:21-cr-00527-RDM | 111(a) | Mr. Byerly purchased and brought with him to the Stop the Steal rally a stun gun. While at the Lower West Terrace, he and other rioters grabbed a reporter and pushed, shoved, and dragged him. Shortly after, Mr. Byerly confronted a police line, raised his hand that held the stun gun, and activated it. The officers reacted by warning officers of the taser. After officers removed the stun gun from Mr. Byerly's hands, he continued to charged towards officers and struck and pushed them. He then grabbed one of the officer's batons and caused an officer to fall onto his hands. | 34 months, Government requested 46 months |
| Egtvedt, Daniel 1:21-cr-00177-CRC | | Mr. Egtvedt entered the Capitol by pushing through a police line and shouted at officers, accusing them of being "traitors." He told another protester that more people should come to the Capitol to disrupt the proceedings. Mr. Egtvedt, who is over 6 feet tall and | 36 months, Government requested 64 months |

| | | weighed well over 300 pounds resisted two police officers after swatting the hand of one officer and grabbing her jacket. | |
|---|---|---|---|
| USA v. Logan Barnhart, 1:21-035-EGS | 111(a)(1) and (b) | He was in the archway that led to the Lower West Terrance entrance. When a law enforcement officer was being attacked by another rioter, Barnhart jumped in to help. He grabbed the officer's ballistic vest and dragged the officer down the steps into a prone position. This allowed other rioters to beat the officer with flagpoles and batons. He then went back to the archway and helped other rioters push against the police line and finally struck at the officers with the base of a flagpole | 36 months, Government requested 63 months |
| USA v. Dennis, 1:21-cr-679-JEB | 111(a)(1) | Defendant rushed the line of officers at the Upper West Terrace. He grabbed an officer's baton and took that officer to the ground and continued to throw punches. He also snatched the officer's baton out of his hands. | 36 months, Government requested 64 months |
| Mault, James 1:21-cr-00657-BAH | 111(a) | Mr. Mault worked with Mr. Mault to bring gear like pepper spray and a baton to their trip to DC. When he and Mr. Mattice arrived at the police line in the West Plaza, Mr. Mault yelled at officers, "Your jobs will be here when you come back after we kick the sh-t out of everyone." After Mr. Mattice sprayed officers, Mr. Mault tried to spray officers with one cannister of chemical spray, but it would not discharge. So he obtained another cannister and successfully discharged | 44 months |

| | | it on the officers in the tunnel. | |
|---|---|---|---|
| Richardson, Howard 1:21-cr-00721-CKK | 111(a) | Mr. Richardson passed metal barriers and police officers and waived a blue and white Trump flag. He then made his way to the front of a crowd and approached a police line. While he was close to officers, Mr. Richardson raised the flagpole and forcefully swung it downward to strike a police officer, and then swung it again to hit the officer a second and third time. Mr. Richardson used enough force that he broke the flagpole on the third strike to the officer. | 46 months |
| Neefe, Marshall 1:21-cr-00567-RCL | 111(a) | Mr. Neefe conspired with his codefendant, Mr. Smith, before January 6 about his dissatisfaction with the election and how he was "getting ready to storm D.C." In the weeks leading up to January 6, Neefe and Smith discussed their intentions to travel to DC and bring batons. Once at the Capitol, Neefe and Smith assaulted MPD and USCP officers by hoisting and pushing an 8x10 foot metal sign into a line of police officers which hit the officers. Neefe entered the Capitol building and refused to leave. After the attack, Neefe wrote that he would bring a gun next time and that he wanted to hurt officers. He also expressed a desire to lynch Black Americans and kill Mitch McConnell. | 41 months |
| Smith, Charles Bradford | 111(a) | Mr. Smith conspired with his codefendant, Mr. Neefe, before January 6 about his dissatisfaction with the | 41 months |

| | | | |
|---|---|---|---|
| 1:21-cr-00567-RCL | | election and how he was "getting ready to storm D.C." In the weeks leading up to January 6, Neefe and Smith discussed their intentions to travel to DC and bring batons. Smith messaged others on Facebook that he had a military style knife that he planned to take to DC. In one post, Smith commented "Sacrifice the Senate!!!!!" Once at the Capitol, Smith and Neefe assaulted MPD and USCP officers by hoisting and pushing an 8x10 foot metal sign into a line of police officers which hit the officers. A video shows Smith encouraging other people to push the sign into the line of officers. Another video shows Smith encouraging people to keep forcing a door closed to keep police inside the Capitol so they could not respond to the crowd outside. After January 6, Smith posted "Got Gassed so many times, shit is spicy but the Adrenaline high and wanting to 'Get' Pelosi and those f—ks" and that he "was literally fighting with Cops." | |

## **Conclusion**

For these reasons, Defendant respectfully requests a period of incarceration that includes no more than one year and one day, along with other conditions this Court sees appropriate.

Respectfully submitted,

Adam Obest
*By Counsel*

 /s/Sam Moore_____
Samuel C. Moore
Moore, Christoff & Siddiqui, PLLC
526 King St., Suite 506
Alexandria, VA 22314
Phone: (703) 535-7809
Fax: (571) 223-5234
scmoore@moorechristoff.com
*Counsel for Adam Obest*

## Exhibits

1. Letter from John Hadley
2. Letter from Carra Draper
3. Letter from Blaine E. Young Jr.
4. Letter from Richard A. Goldschmidt
5. Letter from Robert W. Smith
6. Letter from Rosalyn Gill
7. Letter from Richard Testo
8. Letter from P. Adam Speedy
9. Letter from Yusun Y. Beck
10. Letter from Charles Harlan
11. Letter from Joseph Kopasek
12. Letter from Jason Moore
13. Letter from Aedan T. O'Connell
14. Letter from Daniel Steinke
15. Letter from Matthew Johnson
16. Letter from James L. Bresette

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of December 2024, I electronically filed the foregoing

with the Clerk of Court Using the CM/ECF system, which will then send a notification of such

filing (NEF) to:

AUSA Rachel Freeh
601 D Street
Washington, DC 20530
202-714-6473
rachel.freeh@usdoj.gov

AUSA Sonia Williams Murphy
1100 L Street NW
Washington, DC 20530

202-305-3067
sonia.murphy@usdoj.gov


    /s/ Sam Moore
Samuel C. Moore
Moore, Christoff & Siddiqui, PLLC
526 King St., Suite 506
Alexandria, VA 22314
Phone: 703-535-7809
Fax: 571-223-5234
scmoore@moorechristoff.com
*Counsel for Adam Obest*