**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:23-cr-00267 (APM)** |
| **ADAM RYAN OBEST,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Adam Ryan Obest to 51 months' incarceration—the low-end of the applicable advisory Sentencing Guidelines range of 51-63 months, followed by three years of supervised release, and order Obest to pay $2000 in restitution and $285 in mandatory assessments.

## I.    INTRODUCTION

On January 6, 2021, the Defendant, Adam Obest, participated in the attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

For approximately ten minutes, Obest attacked police officers on the West Front of the Capitol building as those officers attempted to hold a police line and prevent rioters from storming the building. In the midst of this confrontation, as he attempted to force the officers' retreat, Obest made his motivation apparent: "this is our country," he yelled at one of the officers. Seconds later, Obest grabbed another officer's baton and began taunting him: "fight with it, fight with it," Obest yelled, as he struggled to pull the baton from the officer. Obest and the other rioters eventually overwhelmed those officers at approximately 2:31 p.m., forcing the officers' line to crumble. Obest subsequently picked up a smoke grenade and threw it towards officers. Many rioters soon reached and entered the Capitol building.

Obest, an Army veteran and former government employee, claims to be a patriot. But on January 6, 2021, as he physically battled officers attempting to protect the United States Capitol building, Obests's actions embodied the antithesis of patriotism. For his actions on January 6, Obest was convicted of assaulting a police officer, in violation of 18 U.S.C. § 111(a), and other crimes. The government recommends that the Court sentence Obest to 51 months of incarceration. A 51-month sentence reflects the gravity of Obest's conduct, will deter Obest and others from engaging in similar conduct, and is sufficient, but not greater than necessary, to achieve the purposes of sentencing.

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to paragraphs 12-17 of the Presentence Investigation Report ("PSR"), ECF No. 53, for a short summary of the January 6, 2021 attack on the United States Capitol by thousands of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Obest's Facebook Posts and Communications Prior To January 6, 2021

Pursuant to its investigation of Obest's conduct on January 6, the government received and reviewed a number of records from Obest's Facebook account, which he operated under the name "Adam Blest."  Excerpts of those records are being submitted with this Sentencing Memorandum as Sentencing Exhibit 1.

### *November 2020 Trip to Washington, D.C.*

According to Obest's Facebook records, he visited the U.S. Capitol in November of 2020 with his family. Obest posted a picture on Facebook of his family posing in front of the Capitol building, notably in front of bike racks marking the restricted area around the building. *See* Gov't Trial Exhibit 400.11 at page 3. From the image, it appears that Obest and his family respected the

restricted perimeter set up around the Capitol building during that visit.



*Image 1: Government Exhibit 400.11 (Page 3)*

***Obest's Pre-January 6 Statements on Social Media***

Obest's communications on Facebook before January 6 show that he closely tracked the 2020 Presidential election. Following the election, his communications reveal that he believed that there was fraud in the election, was upset about the 2020 election results, and hoped that former President Trump's administration would be "vindicated."  *See* Sentencing Exhibit 1 at page 1.[2]

---

[2] The page number citations here refer to the page numbers at the bottom-center of Exhibit 1 and not the page numbers associated with the Facebook returns in the upper right-hand corner of Exhibit 1.

For example, on November 5, 2020, two days after the 2020 Presidential election, Obest commented on another user's Facebook post:

> Yes, I agree it does not look good to me. Only thing I can think is that the storm only gets worse before you get to the eye of the storm and in the calm. Having said that, maybe this is God's plan to expose the lying and cheating that we already have seen during the 4 years of Trump's administration being attacked on all sides . . . It's gonna be a fight for sure and the media set this up for sure. They are led by the prince of the power of the air.

*See* Sentencing Exhibit 1 at page 1. And on November 10, 2020, Obest replied to a comment on a Facebook post, stating in part: "The same people who don't put their faith and life in God's hands, don't believe that the election was stolen by a corrupt election process." *See* Sentencing Exhibit 1 at page 3.

In Facebook messages, posts, and voice messages leading up to January 6, Obest repeatedly stated that he believed it was time to "rise up" and "fight" on January 6, and compared January 6 to the American Revolution. For example:

- On December 20, 2020, Obest commented on a photo posted by another user: "We will follow your lead when the call is made."

- On December 23, 2020, Obest commented on a video on Facebook: "Lead the way bro; let's start the new American Revolution."

- On December 27, 2020, Obest commented on a post: "Make it happen!!! Make the call!! Time to rise up and fight for America's freedom."

- On December 28, 2020, Obest commented on another user's video: "It's time to fight- no doubt. I believe January 6 is the beginning of it. See you there."

- On January 2, 2021, Obest commented on another user's post: "It's time to rise up and fight. Will it start January 6th? I'll be there and will be prepared to see if so . . .."

- On January 2, 2021, Obest commended on a post: "Let the games begin a.k.a.

revolution."

- On January 5, 2021, Obest commented on a video posted by former President Trump, "Time to fight! Time to rally in the pursuit of FREEDOM! It starts January 6th."

*See* Sentencing Exhibit 1 at pages 4 to 8, 11, and 12; *see also* Gov't Trial Exhibit 400.1.

As January 6 approached, Obest attempted to recruit others to go to Washington, D.C. and was critical of those who suggested they did not plan to attend the events on January 6. *See e.g.,* Gov't Trial Exhibit 400.13 (encouraging another Facebook user to take off work); Sentencing Exhibit 1 at page 16 (criticizing "all kinds of people on social media locally in MD 'who got to work…'"). When another user told Obest he did not plan on going to Washington, D.C. on January 6, Obest commented, "Who else will stand then?" Gov't Trial Exhibit 400.19. In the early morning hours of January 6, Obest expressed to another Facebook user that "Taking off tomorrow is greatest reason to other than religious or family." Gov't Trial Exhibit 400.17.

## C.    Obest's Role in the January 6, 2021 Attack on the Capitol

Obest's crimes on January 6, 2021 were well-documented through body worn camera (BWC) footage from the Metropolitan Police Department (MPD), open-source video, and surveillance footage from outside of the Capitol (CCTV).

Obest and his wife attended then-President Trump's "Stop the Steal" rally on the National Mall in Washington, D.C. on the morning of January 6, 2021. After listening to the then-President's speech, Obest and his wife walked to the U.S. Capitol. Obest wore a camouflage hat and carried an approximately five-foot long metal flagpole to which the United States flag was affixed.

By approximately 2:22 p.m., Obest and his wife were on the West Front of the Capitol

building along with thousands of other rioters. Figure 1, below, shows Obest on the Lower West Terrace of the Capitol building waiving other rioters towards the building.



*Figure 1: Screenshot from Gov't Trial Exhibit 605 at 44:28 Showing Obest (circled) Waiving the Crowd Towards the Capitol Building*

Notably, multiple layers of fencing around the entirety of the Capitol building constituted a restricted perimeter. The public was not permitted within that perimeter on January 6. In particular, a barricade made of bike racks and a police line marked the restricted perimeter across much of the West Front of the Capitol building at this time. *See* Gov't Trial Exhibits 100, 101, and 200.

At approximately 2:22 p.m., Obest approached the police line, holding his long, metal flagpole. Obest's wife stood behind him. Metropolitan Police Department (MPD) Officer Heather Lynn directly instructed Obest to "stay back." Gov't Trial Exhibit 506.1 at 5:57. Officer Lynn and the officer next to her both extended their arms to gesture to Obest to move back. Officer Lynn then

repeatedly commanded Obest to "put the pole down" and "do not come up here." *See* Gov't Trial Exhibit 506.1 at 6:00. Obest refused to obey Officer Lynn's commands and instead replied, "you guys have a job, and our job is for freedom, you know it." *Id*. at 6:37.

After a brief retreat from the police line, Obest again reengaged with officers. At approximately 2:29 p.m., officers on the West Front were commanding a crowd of people, including Obest, to "back up." *See* Gov't Trial Exhibit 507.1 at approximately 5:15. Once again, Obest ignored the officers' commands and instead moved towards them. *See id*. at approximately 5:52. Obest then brought down his flagpole in a sweeping motion towards officers, appearing to scrape an officer's helmet with the flagpole. *See* Gov't Trial Exhibit 101 at 9:08; Gov't Trial Exhibit 507.1 at 6:01; Gov't Trial Exhibit 615 at 43:02.



***Figure 2: Screenshot from Gov't Trial Exhibit 507.1 at 6:01 Showing Obest Reaching to Bring Flagpole Down on Officer***

Moments later, Obest verbally engaged with an officer in the midst of the crowd. *See* Gov't Trial Exhibit 509.1 at approximately 5:15. It is not clear what Obest said to that officer, but he appears to be speaking to the officer in an animated way.

At approximately 2:30 p.m., members of the crowd around Obest yelled at and physically engaged with officers who were attempting to move them back, away from the Capitol building. Obest yelled at officers, "this is our country." *See* Gov't Trial Exhibit 508.1 at 6:00.



*Figure 3: Still Screenshot from Gov't Exhibit 508.1 at 6:00 showing Obest Yelling at Officers*

At 2:31 p.m., Obest pushed through the crowd of rioters to the front of the police line and shoved his flagpole outward towards the officers. Seconds later, Obest thrusted his body towards the police line while holding his flagpole. He extended his right arm, shoving an officer. MPD Lieutenant Gavin Nelson attempted to grab the flagpole. Obest and Lieutenant Nelson struggled over the flagpole as Obest said repeatedly, "it's a flag." After a short tug-of-war, Obest was able to retain the flag and retreated back into the crowd.

Less than one minute later, Obest (i) jabbed the hollow end of the flagpole towards officers; (ii) grabbed the flagpole with two hands; and (iii) swung the flagpole towards the police line. An officer grabbed the flagpole as Obest swung it. A few seconds later, Obest grabbed MPD Officer Jonathan Chen's riot baton and yelled, "fight with it, fight with it," while holding his flagpole in his other hand and over his head.

10



***Figure 4: Screenshot from Gov't Exhibit 501 at 1:11:31 Showing Obest Grabbing Officer Chen's Baton with his Flag Raised Above his Head***

At this point, the police line on the West Front had fallen and rioters rushed towards the building. Minutes later, at approximately 2:36 p.m., Obest picked up a smoke grenade and threw it towards officers. Obest eventually left the restricted area, apparently without further incident.

11



*Figure 5: Screenshot from Gov't Exhibit 101 at 15:51 Showing Obest Throwing Smoke Grenade Towards Officers*

### D. Obest's Statements After January 6, 2021

After January 6, 2021, Obest expressed no remorse for actions. Instead, he repeatedly bragged on Facebook that he "was there" (*see e.g.*, Gov't Trial Exhibit 400.3) and was "very close to the Capitol bldg." *See e.g.,* Gov't Trial Exhibit 400.15. He also consistently and falsely insisted that the riot was "96% peaceful". *See e.g.,* Gov't Trial Exhibit 400.3 ("I was there and it was 96% peaceful"); Gov't Trial Exhibit 400.5 ("96% of it was peaceful").

In multiple Facebook posts immediately following January 6, Obest defended his actions, again compared the day to a revolution, and expressed pride in his participation. In one post, Obest explained the reasoning behind his actions: "They (We) were stating the land is ours-home of the free and land of the Brave. Not the land of fear and lies and corruption." Sentencing Exhibit 1 at page 12. On January 7, he posted on Facebook, stating in part, "I would've stood in 1776, in the

Civil War, and in the civil rights movement and other major conflicts between good and evil."
Sentencing Exhibit 1 at page 13. He later posted, "We are almost a communist nation unless we
patriots have something to say about it. January 6 was just the beginning of a long battle."
Sentencing Exhibit 1 at page 15.

Further, Obest compared his involvement in the riot on January 6 to individuals who
protested in the Black Lives Matter movement. On January 8, he commented on Facebook: "I said
any damaging property and entering the Capitol is unjustified and wrong. I said standing on the
Capitol grass and standing for a cause is justified. I don't condemn people who want justice for
black people especially when it's very disadvantaged to them who use public defenders. These
protests were mainly about unfair elections and I support that." *See* Sentencing Exhibit 1 at page
17.

Notably, in a Facebook audio message from January 8, 2021, Obest described the police
line he encountered on January 6. According to Obest, as he and the other rioters "got closer" to
the Capitol building, they saw that "police were pushing back the people" and they "resisted." *See*
Gov't Trial Exhibit 38.

On January 9, 2021, Obest visited the White House. He posted pictures of his family during
that visit on Facebook. One user commented on those pictures, "Insurrectionists!!!! Great pics
bro![,]" to which Obest replied: "LOL. Nevertheless, anytime I can stand against tyranny, lies, and
oppression, I'll be patriot or a.k.a. insurrectionists!  Even though, this was three days after the
Capitol situation. Peace[.]"Gov't Trial Exhibit 400.10.

In the weeks that followed, Obest distinguished the actions of peaceful protestors from

those who entered the building or damaged property, implying that he fell within the former group of people. *See e.g.,* Sentencing Exhibit 1 at page 17 ("Nevertheless, please contact me if you wanna know the real truth about January 6. Not everybody there was entering the building or breaking things. Anyone that did enter the building will be punished, but at the same time, most people were just rallying for freedom and against corrupt and fraudulent elections."); Sentencing Exhibit 1 at page 10 ("damaging property and entering the Capitol is unjustified and wrong . . . standing on the Capitol grass and standing for a cause is justified . . . ."); Gov't Trial Exhibit 400.5 ("There was nothing wrong with being there . . . The crimes are only committed if they broke windows or entered the building of Congress").

He also continued to defend his actions in the weeks that followed January 6. On January 14, Obest posted on Facebook, "I don't begrudge it and **I do not apologize for it**. People are pissed and rightfully so when the election was fraudulent." Gov't Trial Exhibit 400.8 (emphasis added). Obest also continued to criticize those who didn't participate in the January 6 riot, commenting on another user's photo on Facebook on January 21, 2021: "That's why you should've fought tooth and nail to oppose election fraud and corrupt theft of the will of the people." *See* Sentencing Exhibit 1 at page 9.

### III.    THE CHARGES

On August 9, 2023, a federal grand jury returned an indictment charging Obest with the following Eight Counts:

- Count One: 18 U.S.C. § 231 – Civil Disorder

- Count Two: 18 U.S.C. § 111(a)(1) – Assaulting, Resisting, or Impeding Certain Officers (MPD Lt. Nelson)

14

- Count Three: 18 U.S.C. § 111(a)(1) – Assaulting, Resisting, or Impeding Certain Officers (MPD Officer Chen)

- Count Four: 18 U.S.C. § 111(a)(1) and (b) – Assaulting, Resisting, or Impeding Officers Using a Dangerous Weapon

- Count Five: 18 U.S.C. § 1752(a)(1) and (b)(1)(A) – Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon

- Count Six: 18 U.S.C. § 1752(a)(2) and (b)(1)(A) – Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon

- Count Seven: 18 U.S.C. § 1752(a)(4) and (b)(1)(A) – Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon

- Count Eight: 40 U.S.C. § 5104(e)(2)(G) – Physical Violence at the Capitol Building or Grounds

After a three-day bench trial, on August 2, 2024, this Court convicted Obest of Counts One, Three, and Eight and of the lesser included offenses for Counts Five, Six, and Seven, and acquitted him of Counts Two and Four.

## IV.    STATUTORY PENALTIES

The statutory maximum penalties for each of the counts of conviction are set forth in PSR paragraphs 131-34, 139-42, 148-50, and 158-63.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

15

The government and Probation agree on the following Offense Level computations with respect to Counts One, Three, Five, Six, and Seven. Count Eight is a Class B misdemeanor, and therefore the Guidelines do not apply. See 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

**Count One: 18 U.S.C. § 231 Civil Disorder**

| | |
|---|---|
| Base Offense Level | 10 |
| Physical Contact | +3 |
| Cross Reference to § 2A2.2, Aggravated Assault | |
| Base Offense Level | 14 |
| Official Victim | +6 |
| **Total** | **20** |

**Count Three: 18 U.S.C. § 111(a)(1) – Assaulting, Resisting, or Impeding Officers**

| | |
|---|---|
| Base Offense Level | 10 |
| Physical Contact | +3 |
| Cross Reference to § 2A2.2, Aggravated Assault | |
| Base Offense Level | 14 |
| Official Victim | +6 |
| **Total** | **20** |

**Count Five: 18 U.S.C. § 1752(a)(1) – Entering and Remaining in a Restricted Building or Grounds**

| | |
|---|---|
| Based Offense Level | 4 |
| Restricted Building or Grounds | +2 |
| Cross Reference to Count One | |
| Base Offense Level | 14 |
| **Total** | **14** |

**Count Six: 18 U.S.C. § 1752(a)(2) – Disorderly and Disruptive Conduct in a Restricted Building or Grounds**

| | |
|---|---|
| Based Offense Level | 10 |
| Physical Contact | +3 |
| Cross Reference to § 2A2.2, Aggravated Assault | |
| Base Offense Level | 14 |
| **Total** | **14** |

**Count Seven: 18 U.S.C. § 1752(a)(4) – Physical Violence in a Restricted Building or Grounds**

| | |
|---|---|
| Based Offense Level | 10 |
| Physical Contact | +3 |
| Cross Reference to § 2A2.2, Aggravated Assault | |
| Base Offense Level | 14 |
| Official Victim | +6 |
| **Total** | **20** |

The government and Probation Office disagree on the proper grouping analysis.

The government's position is that, under U.S.S.G. § 3D1.2, there are three separate Groups. Group A consists of only Count One, Civil Disorder in violation of 18 U.S.C. 231(a)(3). The victims of this offense are the group of MPD officers who Obest obstructed on the West Front, including Officer Lynn, Lt. Nelson, Officer Chen, and others. The offense level for Group A is 20.

Group B consists of Counts Three and Seven. The victim of these counts is MPD Officer Chen. The combined offense level for Group B is 20.

Group C consists of Counts Five and Six. The victim of these counts is Congress. The combined offense level for Group C is 14.

The Probation Office, in error, groups Counts One, Three and Seven, positing that Officer Chen is the "primary victim" for these offenses. But Probation's proposed grouping analysis ignores that there were several officers whose efforts to control and disperse the crowd were impeded by Obest. *See* the Court's Oral Ruling, ECF No. 45 at 6-7 (describing "multiple acts" Obest committed with the "intent to obstruct, impede, or interfere with officers performing their duties."). The other officers were not "indirect" or "secondary" victims. *See* USSG § 3D1.2, comment n.2.  Under U.S.S.G. § 3D1.4(a) "the Group with the highest level" counts as "one Unit," and under U.S.S.G. § 3D1.4(a), the analysis must "[c]ount one additional Unit for each Group that is equally serious or from 1 to 4 levels less

17

serious." The analysis must "count as one-half Unit any group that is 5 to 8 levels less serious than the Group with the highest offense level," and must disregard "any Group that is 9 or more levels less serious than the Group with the highest offense level." Such Groups will not increase the applicable offense level but "may provide a reason for sentencing at the higher end of the sentencing range for the applicable offense level."

Here, Groups A and B will each count as one Unit, and Group C will count as one half unit, resulting in an increase of offense level of 3 levels. The total combined offense level is 23.

At criminal history Category II, as calculated by Probation, the Sentencing Guidelines range is 51 to 63 months.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Obest's violent and felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Over the course of approximately ten minutes on the West Front of the Capitol building, Obest physically assaulted and verbally abused multiple officers as they fought to hold a police line and protect the Capitol building and all of those inside.

The nature and circumstances of Obest's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 51 months of incarceration.

18

### B. Obest's History and Characteristics

Obest has a long history of inability to follow the law. In 2013, Obest was arrested for violation of a protective order in Hartford County, Maryland. *See* PSR ¶ 66. Obest was ordered to stay away from his ex-wife's residence, yet he ignored the court's order and visited her residence anyway. *Id*. Then, in 2014, Obest was found to be in violation of probation because he failed to follow his probation officer's lawful instructions. *Id*. In March of 2015, Obest was found guilty of one count of violation of a protective order. *Id*.

Meanwhile, in February of 2015, Obest violated another temporary protective order by contacting his ex-wife *while in custody* and "harassing" her. *See* PSR ¶ 67. He "coached [his ex-wife] on what to say if anyone asked about his phone calls." *Id*. Ultimately, he was again found guilty of violation of a protective order in 2017. *Id*. And in 2018, Obest was once again arrested for violation of a post-trial release condition. PSR at ¶ 68. In that instance, Obest went to his ex-wife's home and "yelled" at her. *Id*.

Obest's aversion to the rule of law is troubling given that he is a twenty-year veteran of the Army National Guard. PSR ¶ 118. From November 2007 to December 2010, he was in the Maryland National Guard Honor Guard, during which time he buried veterans for the State of Maryland Veterans Affairs. *Id*. During his time in the Military, Obest held a security clearance. *United States v. Obest*, 1:23-cr-267, July 25, 2024 Trial Tr. at 349:22-23.

Obest is also former government employee of the Centers for Medicare or Medicaid Services, a division of the Department of Health and Human Services. PSR ¶ 117. Obest previously worked in a federal government building in Washington, D.C., and had to go through security

screening to get into his office building on a daily basis. *United States v. Obest*, 1:23-cr-267, 7/25/24 Trial Tr. at 349:17-18; 350:7-13.

Obest's prior military and civilian service is both aggravating and mitigating. While it is commendable that Obest served in the Army for a significant portion of his adult life, his service also demonstrates that he should have known better than to violently assault uniformed officers as they fought to protect the Capitol building on January 6. It is especially disturbing that Obest would use a flagpole to assault officers, given his testimony that "the flag means something" and is "meant to be held and used sacredly." *United States v. Obest*, 1:23-cr-267, 7/25/24 Trial Tr. at 334:18; 335:1. And it is deeply concerning that Obest would betray the Army's core values—including the protection of the Nation's democratic institutions—and participate in an attack on our democracy.

Furthermore, given that Obest previously worked in a federal building in Washington, D.C. and was familiar with security protocols, it should have been abundantly clear to him that the Capitol building was off limits on January 6, particularly in light of the multiple security barriers and signage posted around the building. *See United States v. Obest*, 1:23-cr-267, 7/25/24 Trial Tr. at 359.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Obest's criminal conduct on January 6 was the epitome of disrespect for the law. *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was

was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### C.  The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3]  The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a lengthy term of incarceration. *First*, Obest has multiple convictions for violations of a protective order. These convictions demonstrate a lack of respect for the rule of law and a repeated refusal to obey legal orders.

*Second*, the PSR, and Obest's actions on January 6, suggest that he struggles with controlling his anger. PSR ¶ 99. This tendency may make it more likely that he will commit other crimes in the future, including potentially violent crimes. The government further believes that Obest could benefit from programs available to incarcerated individuals. PSR ¶ 147.

*Third*, Obest's statements of remorse at trial were insincere, at best. In the days following January 6, Obest repeatedly bragged about his presence at the Capitol, stated that the riot was "96%

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

peaceful," and blatantly declared that he would not apologize for his participation on January 6. During trial, he conveniently could not recall his actions as they were portrayed in video footage, shifting the blame to the environment around him. For instance, when showed video of his actions on January 6, Obest said, "it's just one more thing I regret *I had to be in the middle of.*" 7/25/24 Trial Tr. at 334:16-17 (emphasis added).

Obest's lack of accountability for his actions, as well as his prior disrespect for the law, demonstrate that his sentence must be sufficient to provide specific deterrence from committing future crimes.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision

23

leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[5] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Mazza*, 21-cr-736 (JEB), the defendant pled guilty to violating 18 U.S.C. § 111(a)(1) and a D.C. Code firearms offense. Like Obest, Mazza witnessed violence on the Capitol Grounds, and like Obest, Mazza (using a baton) assaulted an officer. Mazza also brought two loaded firearms to the Capitol. Judge Boasberg sentenced Mazza to 60 months' incarceration. Although Obest did not have a firearm on Capitol Grounds, he violently engaged with multiple officers with a flagpole as they were holding a line to protect the Capitol, and attempted to take a

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

baton from an officer.  Moreover, Obest, unlike Mazza, did not accept responsibility for his conduct, but rather defended his conduct in the days following January 6.

In *United States v. Vincent Gillespie*, 22-CR-60 (BAH), the defendant, like Obest, engaged in pushing, shoving, yelling, and fighting with police officers. Gillespie screamed "traitor" at the police, among other things, and, while still on Capitol grounds, stated the following during a video interview: "We were very close. We were almost overpowering them . . . That's what I would hope [we] would do. Take it over, take it over. Own it for a few days. I'm not an anarchist, but you can't let this stand what happened in this election."

Obest similarly made statements before January 6 in which he expressed his concerns about the election and called for a revolution. Although he was not charged with using a deadly or dangerous weapon, Gillespie gained control of police riot shields and used them against police. He also used his hands to grab an MPD Officer by the arm for several seconds. Different from Obest, however, Gillespie was charged with only one count of assaulting, resisting, or impeding certain officers, for which he was convicted by jury. The jury also convicted Gillespie of civil disorder and two violence-related misdemeanor counts. The jury hung on a number of other charges, including obstruction of an official proceeding. Judge Howell sentenced Gillespie to 68 months of incarceration.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Obest was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See*

*Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[6]

Because Obest engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Obest responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"); *see also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm";

---

[6] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Obest to pay $2,000 in restitution for participation in the January 6 riot. This amount fairly reflects Obest's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.  FINE

Obest's convictions for violations of 18 U.S.C. §§ 231(a)(3), 111(a)(1), 1752(a)(1), (2), and (4) and 40 U.S.C. § 5104(e)(2)(F) subject him to a statutory maximum fine of $250,000 for Counts One and Three, $100,000 for Counts Five through Seven, and $5,000 for Count Eight. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider Obest's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). The burden is on Obest to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir.

1994). "In assessing a defendant's income and earning capacity, the court properly considers whether a defendant can or has sought to 'capitalize' on a crime that 'intrigue[s]' the 'American public.'" *United States v. Seale*, 20 F.3d 1279, 1284–86 (3d Cir. 1994).

Here, Obest's financial assets as set forth in the PSR suggest that he is unable, and is unlikely to become able, to pay a fine. PSR ¶ 130. However, the government does note that Obest raised over $3,000 on a Give Send Go page created by his wife to assist with costs related to his charges for participating in the January 6 riot. *See* https://www.givesendgo.com/GARCS.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 51 months' incarceration—the low-end of the applicable advisory Sentencing Guidelines range of 51-63 months, followed by three years of supervised release, and order Obest to pay $2000 in restitution and $285 in mandatory assessments.


Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    */s/ Sonia Murphy*
SONIA MURPHY
Senior Trial Counsel
District of Columbia Bar No.
483072 601 D Street NW
Washington, D.C. 20530
(202) 305-3067
Sonia.murphy@usdoj.gov

29

_/s/ Rachel Freeh_
RACHEL FREEH
Assistant United States Attorney
District of Columbia Bar No.
1736082 601 D Street NW
Washington, D.C. 20530
(202) 252-7749
Rachel.freeh@usdoj.gov